Rita M. DINGER, Petitioner,

v.

**STATE BAR BOARD of the State of North Dakota, Respondent.**

Civ. No. 9965.

Supreme Court of North Dakota.

Oct. 28, 1981.

Murray, Olson, Larivee, Bohlman & Engen, Grand Forks, for petitioner; argued by Bruce E. Bohlman, Grand Forks.

Fleck, Mather, Strutz & Mayer, Bismarck, for respondent; argued by Thomas A. Mayer, Bismarck.

SAND, Justice.

The applicant, Rita Dinger, and another party,[1] pursuant to Rule 1(3), Admission to Practice, petitioned this Court to review the procedure resulting in a negative recommendation made by the North Dakota State Bar Board regarding her application for admission to practice law in the state of North Dakota.

Dinger took the regularly scheduled examination conducted by the North Dakota State Bar Board but failed to meet the grades and criteria established in order to receive a favorable recommendation.

According to the policy adopted by the Bar Board and in effect at the time, in order to receive a favorable recommendation the applicant must have obtained an overall average of 70 or more in the essay examinations plus a score of 70 or more in at least 6 of the 8 essay examinations, a score of 70 or more in legal ethics, and a scale score of at least 125 on the multistate examination.

The State Bar Board, after the examination, also adopted a supplemental policy which was in effect at the time the applicant's examinations were regraded which consisted of averaging[2] the essay and mul-

---

1. Our Clerk of Court has advised us that the "other party" has since then successfully taken the bar examination and has been admitted to the state bar of North Dakota to practice law. The petition of the "other party" is moot and will not be considered.

2. The averaging method applied by the State Bar Board to the applicants, including Dinger, who requested and had their examinations regraded, is explained by Petitioner's Exhibit 8 which, in pertinent part, provides in pertinent part as follows:

    "*Method 1* is known as the 'Range of Scores.' The highest MBE score is given a value equal to the highest essay score and the lowest MBE score is given a value equal to the lowest essay score. The intermediate scores are determined by proportion. For example, if the highest essay score is 93 and the lowest essay score is 63, the range is 30. If the highest MBE score is 178 and the lowest MBE is 88, the range is 90. With the two ranges of 30 and 90, the proportion would be 1 to 3. In other words, an essay score would be equivalent to an MBE score of 91 (an increase of 1 essay point is equivalent to an increase of 3 MBE points), an essay score of 65 would be equivalent to an MBE score of 94 and on up to an essay score of 93 is equivalent to an MBE score of 178.

tistate scores using method I and rereading and regrading the essay examinations upon request of the applicant. The policy nevertheless continued the requirement that the applicant must obtain an overall average grade of no less than 70 and a grade of 70 or more in at least 6 of the 8 essay examinations and a grade of 70 or more in legal ethics.

In accordance with the supplemental policy, the Board, agreed to regrade the essay examinations in those subjects specifically requested by Dinger in which she received a grade below 70. After this was accomplished, Dinger still did not meet the minimum requirements to receive a favorable recommendation from the State Bar Board. Dinger then requested the Board to reread and regrade all of her essay examinations. The Board agreed to do this and the following scores resulted:

| | Initial Scores | First Regrading | Second Regrading |
|---|---|---|---|
| Legal Ethics | 80 | | 80 |
| Civil Procedure | 72 | | 74 |
| Business Associations | 60 | 70 | 70 |
| Domestic Relations | 63 | | 42 |
| Equity | 75 | | 75 |
| Wills | 68 | 70 | 70 |
| Trusts | 80 | | 70 |
| Commercial Transactions | 42.8 | | 47 |
| General Essay Average | 67.6 | 69.1 | 66 |
| MBE Adjusted Score | 70.52 | 70.52 | 70.52 |
| MBE Scaled Score | 135 | 135 | 135 |
| Combined Score | 69.06 | 69.81 | 68.26 |

Dinger received a grade of 42 in domestic relations and a grade of 47 in commercial transactions, which gave her an average grade of 66 in the essay examinations and a combined score of 68.26.

Dinger obtained a passing grade in 6 out of the 8 essay examinations and obtained a passing grade in the professional responsibility test and the multistate examinations, but she failed to obtain an overall average of 70 in the essay examinations. Dinger was 1.74 points short of reaching the 70 overall average.

The applicant stated the issues as follows: "Is the bar examination and its administration a fair and accurate test of the legal abilities of . . . [Dinger] and does the bar examination as administered deprive . . . [Dinger] of . . . [her] constitutional rights?"

The applicant contended that the tests were arbitrary and capricious and were not valid tests of the applicant's legal education and qualifications, and as such constituted a denial of due process and equal protection under the fifth and fourteenth amendments to the United States Constitution and § 12 of the North Dakota Constitution. In summary, the applicant contended she should be admitted to the Bar of the State of North Dakota and that the State Bar Board should have given her a positive recommendation.

It was not alleged, nor was any evidence introduced or an argument made, that the original examiners (readers) and graders were incompetent. Neither was it contended that the subsequent examiners (readers) and graders were incompetent. However, an argument was made that the applicant should not have been given a lower grade than what she received at the original examination, but no authority was cited in support of it. We are not persuaded and no further discussion is warranted on this topic.

Dinger argued that essay-type examinations are extremely difficult to grade because too much subjectivity is involved. Ordinary reasoning and logic tells us that a certain amount of subjectivity is concomitant with any essay-type examination. However, such tests are not invalid per se. See *Tyler v. Vickery*, 517 F.2d 1089, (5th Cir. 1975); *Hooban v. Board of Governors of Washington Bar Association*, 85 Wash.2d 774, 539 P.2d 686 (1975); and *Chaney v. State Bar of California*, 386 F.2d 962 (9th Cir. 1967).

In *Whitfield v. Illinois Board of Law Examiners*, 504 F.2d 474 (7th Cir. 1974), the court in effect held that merely alleging that an essay-type examination requires subjective evaluations and as a result the standards of grading are not susceptible to precise definition is insufficient to state a claim for federal relief. We can expand on that statement and conclude that it does

not constitute grounds for setting aside the essay examination without any further showing that the tests were actually graded and read in an arbitrary, unreasonable manner. No such allegation has been made. Dinger merely suggested that because subjectivity was involved the essay tests were unreasonable and arbitrary. However, a mere suggestion or an allegation without evidence or proof in support thereof is of no legal value.

Also, every test or examination, to have any value or significance, must have a passing line or standard that must be met, *In re Fischer*, 425 A.2d 601 (Del.1981), otherwise such test would be a mere exercise in futility for the test is to give the public the assurance, and the protection, that those admitted to practice law have met the minimum requirements. Thus, in the final analysis the test or examination is for the protection of the public.

Our Court, as the supervising body of the legal profession would in fact abrogate its responsibility if it were to establish or condone a system which did not give assurances to the public that those admitted to practice law met at least the minimum requirements. The system we have now may not be perfect and may be improved upon, but until we have an improved system we should not abandon this one.[2a]

Dinger also suggested[3] that the Law School is better equipped to test the student's ability to pass an essay examination. Be that as it may, this does not establish that the test given was conducted improperly or that the applicant should have been given a favorable recommendation.

If the Law School were to conduct the examinations for admission, would it truly be an interested party or would it attempt to bolster its position by passing its students to make the school look better by having no failures. It would be an anomaly to have the school pass the student but fail the student at the bar examination.

The facts of this case clearly disclose that the subjects which were not taken by Dinger were the ones in which she failed badly. This compliments the Law school in that it clearly shows that the applicant passed the subjects taken in Law School and failed in the subjects which were not taken.[4]

The applicant readily accepted the higher grades resulting from a rereading and regrading of the essay examinations, but was highly critical because some grades were reduced. In a sense this parallels the argument frequently presented in criminal cases that if a person is retried the sentence may not be any greater than the sentence that was originally imposed at the first trial unless a reasonable justification for the increase is given. However, such a position regarding the reexamination is without merit.

The applicant also argued that the Board, by changing the method of computing final grades after the examination by employing the averaging method, in effect treated her and other applicants unequally. In a sense this is true, but the unequal treatment was to the benefit of the 14

---

**2a.** This reminds us of the lyrics of a song popular a few years ago: You may not be an angel, for angels are so few, But until the day that one comes along, I'll string along with you."

**3.** Indirectly this suggestion also implies that a student should only be required to attend Law School for a certain period of time and receive a law degree to be admitted to practice law. This type of argument does not take into account the subjects which are treated as electives and which are required to be taken. The State Bar Board is charged with the duty to determine the standards that must be met to be eligible to practice law in this State. If the argument made by the applicant were carried out to its ultimate end we would have two possible solutions: one would be that the applicant need only attend Law School and get a law degree regardless of the topics studied; and the other would be that the State Bar Board merely act in a performa manner and favorably recommend any student who has received a law degree regardless of the courses taken while attending Law School.

**4.** It also suggests that any law student who proposes to take the North Dakota bar examination should take all of the courses that are part of the essay examination, and, in addition or in the alternative, the Law School itself should make all of those topics mandatory rather than elective. This is a matter, however, to be resolved by the Law School and the Bar.

applicants, including Dinger, who failed the test. As a result of the averaging, two applicants out of 14 received a passing grade. However, we do not believe they or Dinger can complain because they were treated more favorably.

Dinger made reference to a letter written by one of the Board members who did the regrading in certain subjects, which letter was addressed to the Secretary and Treasurer of the Board, dated 6 Oct. 1980. The grades of several applicants, but not Dinger's, were transmitted by this letter. The pertinent part of the letter states as follows:

"In several instances I would have reduced the grade given by the readers on some subject. However, where such a reduction would have occurred I have given the applicant the benefit of the grade assigned by the reader and therefore the only changes I have made are those where I have graded higher than the score assigned by the reader in a particular subject."

The Bar Board member who was the author of the letter was called as a witness and was subject to direct and cross-examination. He was asked:

"Q. ... In the case of Rita Dinger, she originally had a score, I believe, of 63 in domestic relations. And then subsequently on the regrade she received a 42 percent which would represent a very highly significant change in the grade, I would think, assuming even some difference in graders. How do you account for that significant change in the grade?

. . . .

"A. That one I did regrade once as I've said before, and the results of regrading were that in commercial transactions her grade was raised approximately five points, and in domestic relations it was reduced by 21 points.

"Q. 21 points, yes.

"A. Well, each of the Applicants who appeared for interviews with us on September the 30th were informed by the Chairman, Mr. McCutcheon, that if we did regrade at their request, we reserved the right to reduce as well as increase their scores. In regrading, my practice was that if the difference between my regrading and the grading by the graders was insubstantial—or unsubstantial, that I would not make a change. There were some papers in addition to the five that are involved in these hearings where I would have reduced them very substantially, and in this one case I did reduce it by the sum of 21 points.

No further significant questions were directed to the author of the letter regarding its contents, etc. We believe if this letter had any direct legal bearing on the outcome of the examinations, this should have been brought out by appropriate examination. No such relation was established. The letter was not addressed to any applicant and, even so, it was written after the examination rather than before, and furthermore, we do not know if or when the content of this letter were made available to the applicants.

Although the letter indicated that the author did not reduce any grades even though he thought some should have been reduced, the author did, however, reduce the grade of at least one other person, in addition to Dinger's. He did not treat Dinger any differently.

In the final analysis, even though the letter may have left an erroneous impression, we do not believe that it constitutes any legal or justifiable grounds to compel us to direct the State Bar Board to change its negative recommendation to a positive recommendation.

Dinger argued and rationalized that because her final average score after regrading came within 1.74 points of a passing grade the State Bar Board, nevertheless, should have given her a favorable recommendation. Such rationale is contrary to the very purpose of a test. If that concept was followed it would disregard the very purpose of an examination. In effect, her argument and rationale, if accepted, would be treating her more favorably than the other. In summary, Dinger is suggesting an unequal consideration and protection

procedure which is the very thing she is complaining about and has unsuccessfully tried to raise as a constitutional issue in this matter.

■ Basically, anyone challenging the effectiveness of an examination, whether it be the essay examination, multiple choice, or any other type, has the burden of establishing its unreliability. No expert witness in the field of testing was presented nor was any evidence introduced regarding the reliability of essay-type tests. They are probably more accurate and real than some other types. A mere assertion or allegation is not sufficient to place the examination in jeopardy. See, *Whitfield v. Illinois Board of Law Examiners, supra.* The applicant has failed to do this in this instance.

Some of the arguments presented here should be made to the Law School and the State Bar Board rather than to this Court. In making this observation we are not suggesting that the Law School make any changes to accommodate the applicants in this instance nor are we suggesting that the State Bar Board retreat from its standards and methods of examination.

The undisputed testimony at the hearing discloses that the examiners (readers and graders) were furnished with specific guides as to what was to be included in the answers. These guides were furnished prior to the time the examinations were read and graded. This was done to offset or overcome any ambiguity that may result from any subjectivity of the examiner that may depend upon interpretation and analysis and be involved in grading the test.

The applicant's argument regarding equal protection, if extended, suggests that in order to avoid successful constitutional challenges the entire group's essay examination would have to be reread and regraded whenever one applicant seeks and obtains a rereading and regrading. This argument is without merit. We fail to recognize any meaningful constitutional issue from the presentation made by Dinger.

■ The applicant has not presented any valid reason or justification to overrule the negative recommendation of the State Bar Board, and accordingly the recommendation of the State Bar Board will be honored.

ERICKSTAD, C. J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.