In the Matter of the Petition of David C. THOMPSON for Review of a Determination of the State Bar Board.

Civ. No. 10462.

Supreme Court of North Dakota.

Dec. 22, 1983.

Chapman & Chapman, Bismarck, for Thompson; argued by Daniel J. Chapman, Bismarck, and David C. Thompson, pro se.

Lundberg, Conmy, Nodland, Lucas & Schulz, Bismarck, for State Bar Bd.; argued by Irvin B. Nodland, Bismarck.

ORDER

Opinions of the Court to grant Application for Admission to the Bar were filed on December 22, 1983, by the Honorable Ralph J. Erickstad, Chief Justice; the Honorable Vernon R. Pederson, the Honorable Gerald W. VandeWalle, the Honorable H.F. Gierke, III, Justices. An opinion to deny the Application was filed by the Honorable Paul M. Sand, Justice.

ORDERED, that a Certificate of Admission to the Bar be issued to David C. Thompson in accordance with the opinions filed and upon his taking the required Oath and Pledge.

The Supreme Court of North Dakota convened at 11 a.m. this 22nd day of December, 1983, with the Honorable Ralph J. Erickstad, Chief Justice; the Honorable Paul M. Sand, the Honorable Vernon R. Pederson, the Honorable Gerald W. Vande-Walle, the Honorable H.F. Gierke, III, Justices; and Luella Dunn, Clerk, being present, and directed the entry of the above Order with Justice Sand voting nay.

SAND, Justice.

David C. Thompson has petitioned this Court, pursuant to Rule 1(d)(3), of the Admission to Practice Rules [1] to review a neg-

---

1. The Admission to Practice Rules applicable to this case are those in effect prior to the amendments of July 1, 1983.

ative recommendation made by the North Dakota State Bar Board (the Board) regarding his application for admission to practice law in this state. The relevant facts in this matter are not disputed.

Thompson wrote the July 1982 bar examination conducted by the Board. The Board's negative recommendation regarding Thompson's application to practice law is based solely on Thompson's failure to achieve a minimum scale score of 130 points on the multi-state bar examination (MBE). Thompson's scores on the essay and the professional responsibility segments of the examination were well in excess of the minimum scores required by the Board for a favorable recommendation.

During the administration of the MBE segment of the exam, certain irregularities occurred. On the morning the MBE exam was to be given a change in the testing location occurred but was not communicated to Thompson until he had arrived at the scheduled test location. While the test was being administered, varying degrees of noise disturbances were prevalent in the test room caused by a sales meeting which was being conducted in an adjacent room. The noises included voices, music, clapping, and other sound disturbances, which occurred throughout the morning but were particularly intense for approximately one-half hour. These disturbances also resulted in distracting movements in the test room caused by applicants and test administrators moving about in an attempt to respond to or to alleviate the disturbances. Also the lighting in the test room was not of an optimal or desired level. The Board had no prior knowledge that a disturbance may occur, nor did the Board have any control over the situation. Although the persons administering the bar exam attempted to remedy the irregularities, they were not entirely successful in doing so, and for that reason the Board provided an additional 27 minutes of testing time for the examinees to take the morning portion of the MBE.

Thompson received a scaled score of 127 on the MBE. Upon being notified that he would receive a negative admission recommendation by the Board, Thompson elected to pursue the formal hearing review process under Rule 1(d)(2) of the Admission to Practice Rules. During the hearing, Thompson asserted that although he did not receive a minimum passing score on the MBE he should receive a favorable recommendation for admission to practice law because he had received a score of 127 on the MBE in spite of the adverse conditions under which he was forced to take the examination and because he had received relatively high scores on both the essay and the professional responsibility segments of the examination. Thompson contended and introduced evidence attempting to demonstrate that he was more adversely affected by the noise and disturbances which occurred during the administration of the MBE than the other examinees.

Thompson's formal hearing was held before a hearing examiner appointed by the Board who, on May 9, 1983, entered findings [2] and recommended that Thompson be given a favorable recommendation by the Board. On May 17, 1983, the Board, through its secretary-treasurer, notified Thompson that,

"After due consideration, the Bar Board by a unanimous vote decided to affirm its previous negative recommendation on the grounds you did not meet the standards set by the Board, namely, a scaled score of 130 or above on the Multistate Bar Examination."

Thereafter, Thompson filed this petition for review of his application by this Court.

Under Rule 1 of the Admission to Practice Rules, an applicant who seeks a review of a negative recommendation by the Board has the burden of proving by a preponderance of the evidence that, notwith-

**2.** The primary function of the hearing examiner is to determine the facts. Other than the disturbance at the MBE, no evidence was introduced tending to establish any irregularity or arbitrari- ness on the part of the examiners or the Bar Board. For that matter, the basic evidence is not in dispute.

standing the Board's recommendation, he should be admitted to practice law in this state. Under North Dakota Century Code § 27–11–19, this Court, after receiving a report of examination results and recommendations from the Board, "shall enter an order authorizing the issuance of certificates of admission to the bar to such applicants therefor as such court considers entitled thereto."

This Court takes judicial notice of its own records. In line with standard recognized procedures, the Board kept this court informed of its policy regarding bar admission procedures. On June 22, 1982, this Court received a letter from the Board's secretary-treasurer explaining the Board's policy for determining pass/fail recommendations of the July 1982 bar examination applicants:

"An applicant must achieve an overall average of 70 in the essay subjects, a minimum scaled score of 130 on the Multistate Bar Examinationnnn and a minimum scaled score of 75 on the Multistate Professional Responsibility Examination. The scores will not be combined."

This Court received and tacitly approved the foregoing policy as adopted by the Board.[3]

Thompson asserts that he was denied the procedural due process to which he was entitled under the Admission to Practice Rules because the Board failed to give due consideration to his case in the following respects:

1. That the Board failed to order a transcript of the formal hearing even though only one of the three Board members attended the formal hearing.
2. That the Board did not request or receive copies of the 18 exhibits of documentary evidence introduced by Thompson.
3. The copies of post-hearing briefs were not made available to the Board until the day on which the Board met

after the formal hearing to consider whether or not to affirm their previous negative recommendation.

I do not believe the administrative practices procedures apply, nor am I persuaded by Thompson's assertions that the Board failed to provide him with a procedurally adequate review as contemplated under the Admission to Practice Rules.

The Board concedes that the facts of this case, as presented by Thompson, are not in dispute. The minutes of the Board's meeting on May 26, 1983, following Thompson's formal hearing before the hearing examiner, demonstrate that the Board gave due consideration to Thompson's request for reconsideration of the Board's negative recommendation:

"Mr. Brown suggested the Board has several alternatives:

1) Admit Applicant #3921 [Thompson] only;

2) Lower passing score for MBE to 125 and admit those who meet that standard;

3) Order transcript of the hearing for the Board's consideration; or

4) Affirm previous negative recommendation.

"Mr. Kelly and Mr. Brown said at the time they gave very serious consideration to lowering the MBE score to 125 or combining the scores and noted that basically it was a matter of judgment, they tried to do what was right, fair and reflective of the standards applicants should be required to meet. The Board indicated from a review of the hearing officer's Findings and Recommendation, nothing was considered that the Board had not taken into account."

After giving serious consideration to Thompson's request for a favorable recommendation, the Board decided to retain its previously announced policy of requiring a minimum scaled score of 130 on the MBE segment of the exam. I believe that, under

---

**3.** Our records do not reflect that the Court asked the Board about the practices and minimum standards in other states on this subject matter.

the circumstances, the Board's decision was neither arbitrary nor unreasonable.

I do not believe an applicant should be passed on the basis that a disturbance or other distracting factors occurred or were present while the examination was in progress. Such a procedure would be contrary to the very purpose of having an examination or standards which are designed for the benefit of the public to assure the prospective licensees meet the minimum requirements to practice law.

Thompson asserts that because the Board decided to readjust its grading procedure on the essay questions it was unfair and unreasonable for the Board not to make some type of readjustment with regard to the MBE segment of the exam. I disagree. With regard to the essay segment of the examination, the Board had adopted a policy of requiring an applicant to achieve "an overall average of 70 in the essay subjects." Two readers graded each essay test and their scores were combined to obtain an average score for each essay test. Subsequent to this grading process, the Board decided to use only the higher score, and, as a result, a number of applicants received passing scores of 70 on the essay segment who would not have otherwise received a passing score.

The grading of essay tests may involve subjective matters, some of which are difficult to fully identify. As an example, the viewpoint and special knowledge of the reader may have a direct bearing on the grade allowed. Even the style of writing or grammar may have some influence on the reader. This subjectivity may have a favorable or unfavorable bearing depending upon the particular situation. However, the grading of the MBE test does not involve such subjective factors. While an argument can be made that the MBE questions and answers may be debatable, the actual grading process does not involve any of those subjective elements or factors.

The MBE and the essay questions are separate and distinct segments of the bar examination. Consequently, the Board's decision to readjust its grading procedure with respect to one segment does not necessarily mandate that it do so with another segment of the exam. The Board asserts that its decision to readjust the essay scores was, at least in part, because there was a wide discrepancy in scoring between the readers. In my opinion, the Board did not act arbitrarily or unreasonably in readjusting its scoring procedure for the essay questions while refusing to make readjustments with regard to the MBE segment of the examination.

I am compelled to conclude that Thompson has not met his burden of proving that he should be admitted to practice law in this state notwithstanding the negative recommendation of the Board. Although it is unfortunate that a disturbance occurred while the MBE test was taking place, I do not believe that it was either unreasonable or arbitrary for the Board to refuse to reduce the previously set minimum passing score of 130 on the MBE, especially in view of the fact that the Board gave applicants additional time to take the MBE segment and that, despite the disturbance, approximately 80% of the July 1982 examinees received an MBE score of 130 or higher. As we stated in *Dinger v. State Bar Board*, 312 N.W.2d 15, 18 (N.D.1981),

> "[E]very test or examination, to have any value or significance, must have a passing line or standard that must be met . . . otherwise such test would be a mere exercise in futility . . . ."

I do not believe we should determine qualifications on the basis of the brief submitted by the applicant because the applicant may have received considerable help in writing the brief. Neither do I believe that we should take into account the oral argument made by the applicant. A person may be very glib in making speeches or, for that matter, may be a great orator, but that does not make that person a lawyer. Facetiously, maybe the court should interview each applicant and also admit senior law students who submit briefs and make oral arguments on cases before the exam is given.

In my opinion, oral statements made to the Court by counsel on the ultimate issue which may seem to be or are inconsistent with the written position of his client, as contained in the appeal, are not entitled to or should be given any serious consideration unless counsel unequivocally states that the client's position has changed accordingly.

This brings us to the focal point: either we abide by the minimum standards we have set up or we disregard them for everyone and suffer the consequences. Credibility is a partner of justice. Disregarding the minimum standards previously approved will not enhance the credibility of the bar, the bar board, or the judiciary.

The applicants, including Thompson, passively accepted the testing process. No complaint was made with reference to the process itself, except the noise and disturbance. The Board recognized this and permitted those who failed to take it over again, but Thompson did not take advantage of this. The net effect of his position is: Because there was a disturbance I am entitled to a favorable recommendation and entitled to admission to practice law in the State of North Dakota.

In every contest or qualifying procedure the rules are announced ahead of time and they are strictly followed, and if some interfering event occurs which may have a direct bearing on the outcome or result a replay is permitted or conducted or the project is declared no contest. In the instant situation, Thompson's contention can be likened to changing the rules after the contest or event, which is frowned upon in every section of our society.

Failure to abide by the standards previously set up and approved can do nothing but bring discredit to the testing process. Maybe students receiving a Juris Doctor degree from the University of North Dakota Law School should be ultimately admitted in lieu of the procedures that are now being employed. I merely pose this as a question, and not as a solution.

Justice Erickstad's opinion states that my opinion failed to discuss the rationale why the action of the Board was not arbitrary or unreasonable. The reasons why I did not discuss the rationale behind the conclusion that the Board did not act arbitrarily or unreasonably is obvious. In my opinion, it is so elementary and basically logical that no explanation is required. When officials, as in this case, follow the testing process and rules previously announced and given tacit approval by this Court, their actions cannot be deemed arbitrary or unreasonable unless the process or rule is arbitrary per se. However, no one has even suggested this. In addition, the actions of an official are given the presumption of being correct. NDCC § 31–11–03(5). The applicant failed to establish either that the Board or the policy, or both, were arbitrary and unreasonable.

In addition, to make the system work the principal (the Court) may not pull the rug from under the agent (the Board) in a situation as we have here.

In view of the conditions under which the MBE exam was written during July 1982 the Board voted to allow those applicants who failed only the MBE segment of the exam to retake the segment providing that they did so by September 1, 1983. During that period, Thompson was involved with this review process of his July 1982 exam results, and he did not retake the MBE exam. Under these circumstances it would be appropriate, and I would have ordered, that Thompson be given an opportunity at the earliest possible time convenient to him to retake the MBE either in this state or elsewhere without paying a registration fee or other charge, but personal expenses incident to taking the exam (*i.e.*, travel expense, lodging, etc.) must be paid by him.

ERICKSTAD, Chief Justice.

PART I.

Justice Sand, without discussing the rationale behind such a rule, apparently adopts as controlling a rule to the effect that we must uphold a decision of the State Bar Board which recommends that we not admit an applicant to practice law in this

state unless that decision is either unreasonable or arbitrary.

For the sake of argument, let us assume that is an appropriate rule to apply in the first part of a discussion of this case. In that context we note that the opinion of Justice Sand states that:

"After giving serious consideration to Thompson's request for a favorable recommendation, the Board decided to retain its previously announced policy of requiring a minimum scaled score of 130 on the MBE segment of the exam. I believe that, under the circumstances, the Board's decision was neither arbitrary nor unreasonable."

He does not address whether or not it was unreasonable or arbitrary not to combine the essay scores with the multi-state examination scores as advocated by the petitioner and recommended by Mr. Joe E. Covington, the Director of Testing of the National Conference of Bar Examiners.

The petitioner asserts, the Bar Board has not denied, and the record seems to reflect that the petitioner would have passed the examination had the Board used any one of three possible methods of combining the scores of the essay and the MBE parts of the examination.[1] In a letter addressed to Luella Dunn as the Secretary of the North Dakota Board of Bar Examiners, dated November 30, 1982, Mr. Joe E. Covington, the Director of Testing for the National Conference of Bar Examiners, said: "The recommendation of NCBE is that the combination of the MBE and essay scores be based on the MBE range of scores."

Justice Sand's opinion states that on June 22, 1982, this Court received a letter from the Bar Board's secretary-treasurer explaining the Bar Board's policy for determining pass/fail recommendations of the July, 1982, bar examination applicants as follows: "An applicant must achieve an overall average of 70 in the essay subjects, a minimum scaled score of 130 on the multi-state bar examination and a minimum scaled score of 75 on the multi-state professional responsibility examination. These scores will not be combined." The Sand opinion goes on to state that this Court received and tacitly approved the foregoing policy as adopted by the Board.

That letter did not explain to the Court that in adopting such a policy we became one of only five states in the nation which required bar applicants to score a particular MBE score without regard to the essay score of the applicant.[2]

The Bar Board's letter did not indicate, and it may be that the Bar Board did not know at the time, but in any case it did not indicate, that the Director of Testing of the National Conference of Bar Examiners in letter of November 30, 1982, recommended a combining of the grades. That this recommendation was made is further supported by the minutes of the Bar Board.[3]

| Arizona | 134 |
| Delaware | 130 |
| Nebraska | 120 |
| Vermont | 137 |

"I trust this is the information you need.
     "Sincerely yours,
          /s/ Joe E. Covington
     Joe E. Covington
     Director of Testing"

3. "Mrs. Dunn told the Board Mr. Covington said there were states that cut off at 130, but most states use some form of combining scores. She stated Mr. Covington's office recommended this. She stated essay scores should be converted to figures that can be combined with MBE scores." Minutes of October 29, 1982, Telephone Conference Call of the State Bar Board (Petitioner's Exhibit 16).

1. The three methods are known as Plan 1: Comparative Range Method, Plan 2: Equi-Percentile Method, and Plan 3: Standard Deviation Method. (Petitioner's Exhibit 14.)

2. A letter from Joe E. Covington, Director of Testing, Multi-state Bar Examination Committee, of April 20, 1983, reads:

                         "April 20, 1983
"Mrs. Luella Dunn
North Dakota Board of Bar Examiners
North Dakota Supreme Court
State Capitol
Bismarck, North Dakota 58505
"Dear Mrs. Dunn:
    "You have inquired about jurisdictions which require for admission to the bar applicants to score a particular MBE score without regard to the essay score of the applicant. To the best of my knowledge jurisdictions having such a rule and the MBE score required are:

It should be pointed out that this case does not involve the issue of a minimum scaled score in conjunction with a failure of the ethics part of the examination (multistate professional responsibility examination) where conceivably there could be a reasonable justification for prohibiting a combination of the scores.

I believe it to be of great significance that the applicant scored 14th out of 92 in the essay part of the examination with an essay average score of 74.6 where the highest essay score was 78.9. Additionally, the applicant scored 111 in the multistate professional responsibility examination where the highest score by North Dakota applicants in the July, 1982, bar examination was 124 and where the majority of the passing scores were less than 111, as only about 17 of the passing scores were 111 or higher.

When the applicant's minimum scaled score of 127 on the multistate bar examination is combined under the comparative range method with his essay score of 74.6, his combined score is 72.069 and his combined rank is 47.0 with a percentile rank of 49.5. This places him above 32 others who would have received a combined score of 70.0 or better.

It should be further noted that the Bar Board failed to give any credence to the findings and recommendations of Ms. Christine A. Hogan, the hearing examiner, who was appointed by the Bar Board in this matter.

Ms. Hogan functioned well as a hearing officer, but, in addition thereto, she was a person uniquely qualified to act in that capacity in light of her service on the subcommittee and the full committee of the Attorney Standards Committee which studies this area of our responsibility and made recommendations to our Court for the adoption of the major part of our present admission to practice rule which provides for an appellate process in conjunction with a negative recommendation of the Bar Board. Her findings and recommendations speak eloquently for the admission of the applicant to the Bar of this state.[4]

4. "North Dakota State Bar Board
"In Re Petition of David Clark Thompson
"FINDINGS AND RECOMMENDATIONS OF BAR BOARD HEARING OFFICER
"The captioned matter was heard before this North Dakota State Bar Board hearing officer on Wednesday, April 27, 1983 at 10:00 o'clock a.m. The petitioner was present and represented by his attorney, Daniel J. Chapman. The Bar Board was represented by its attorney, Irvin B. Nodland. Based upon the testimony and exhibits introduced at the hearing, briefs submitted by petitioner and the Bar Board, and the entire file herein, the hearing officer makes the following findings and recommendations:
"1. The record of this hearing shows that the Bar Board made a negative recommendation with respect to David Clark Thompson's qualifications for admission to the Bar of the State of North Dakota. It is undisputed that the negative recommendation was based solely on the petitioner's failure to achieve a minimum passing score of 130 points on the multi-state bar examination (hereinafter 'MBE'). The petitioner's scores on the remaining segments of the test, known as the essay portion and the professional responsibility portion, were well in excess of the minimum scores required by the Bar Board for passage of the exam.
"2. The record is undisputed that substantial irregularities occurred during the administration of the MBE portion of the bar exam on the first day of the two-day testing period. The irregularities included:
a. A last-minute change in location of the examination that was not communicated to the petitioner until he arrived at the original location set for the test;
b. Loud, continuous noises in the testing room, including loud voices, music, clapping, and other disturbances caused by a sales meeting being held in the same room as the testing room, on the other side of a movable room divider;
c. Significant distracting movement in the testing room caused by applicants and test administrators moving about in response to the noise disturbance; and
d. Inadequate lighting in the testing room.
"3. Although the bar examiners attempted to remedy the irregularities which occurred in the examination procedures by providing twenty-seven minutes of additional testing time for the taking of the morning portion of the MBE, I find this remedy was of little or no benefit to the petitioner for the reason that the petitioner's reasonable test-taking strategy had been to complete the examination within the originally-allotted time frame. It is undisputed that the additional minutes of testing time were announced by the bar examiners near the end of the originally-designated testing period, at a time when the additional minutes would be of no signifi-

cant assistance to those applicants who had already substantially completed the examination.

"4. The irregularities in the testing conditions during the MBE were substantial enough that the MBE scores cannot be relied upon to provide an accurate measurement of the petitioner's actual ability to perform on the standardized test. The MBE is a six-hour objective test administered in two parts, each of which is three hours long. The manual of MBE test procedures (petitioner's Exhibit 5) points out the necessity of maintaining the physical facilities of the examination (lighting, freedom from outside disturbances and distraction, etc.) in order to insure that the applicants are 'comfortable and able to give full attention to the test.' Unless satisfactory test conditions are maintained, there is a substantial risk that the standardized test results will not be reliable.

"I find that the irregularities in the July, 1982, MBE test conditions may well have prevented the petitioner from achieving his maximum performance on the test in that he was unable to devote his full attention to the test for a substantial portion of the time allotted.

"Evidence was presented at the hearing indicating that the validity of standardized test scores is dependent, to some extent, upon maintenance of test conditions conducive to maximum performance by the individual test applicants.

"5. Given the unique irregularities which occurred during the administration of the MBE test in July, 1982, I find that the Bar Board's reliance on a minimum MBE passing score of 130 points in order to base a negative recommendation for admission to the bar in the case of the petitioner was misplaced. I find that, under the testing conditions which occurred, the MBE test results may not have accurately measured petitioner's knowledge of the law or his legal or moral fitness to practice law in this state. The minimum passing score of 130 points in the MBE was adopted a few weeks in advance of the test (see Bar Board Exhibit C) and necessarily assumed that no departures would occur in the administration of the test from the normal, regular testing procedures. Given the substantial deviation from the norm which did occur in the July, 1982 MBE testing procedures, I would recommend that the Bar Board make appropriate allowance for the abnormal test conditions. The Board could either disregard entirely the petitioner's MBE score and rely upon the petitioner's performance on the remaining portions of the bar examination or the Board could adopt a slightly lower minimum passing MBE score, such as 120 or 125, in recognition of the testing irregularities. Petitioner's MBE score was 127, high enough to have passed the MBE in North Dakota in all the years the test has been given, until the score was raised to 130 shortly before the July, 1982 exam. In any event, I find that inflexible adherence to an arbitrary, predetermined, minimum passing MBE score, given the irregularities which oc-

curred during the test, would render meaningless the requirements in the North Dakota Admission to Practice Rules that unsuccessful applicants be given an opportunity to explain their individual concerns in informal interviews and in formal hearings before the Bar Board. I find that one of the purposes for the individual treatment as contemplated in the admission rules is to allow the Bar Board to make an individualized judgment as to a particular applicant's fitness for admission to the bar under the circumstances of the case presented.

"In this case, the record is undisputed that the petitioner possesses in all respects the minimum qualifications for admission with the sole exception of his failure to achieve the minimum passing score of 130 points on the July, 1982 MBE. The record is also undisputed that the passing score of 130 points is arbitrarily chosen by the Bar Board and is not necessarily related to the individual applicant's competence for admission to practice. The National Conference of Bar Examiners reviewed the North Dakota Bar Examination results over the course of the last several years at the request of the North Dakota Board of Bar Examiners. Petitioner's Exhibit 13 indicates that the Director of Testing for the National Conference of Bar Examiners concluded that a passing MBE score of 'not over 130 and not less than 120' would produce a fair result in the North Dakota Bar examination. Consequently, since petitioner scored 127 points on the MBE under highly abnormal and adverse testing conditions, I find that the petitioner has demonstrated his competence for admission to the bar in all respects.

"6. The Bar Board has expressed concern in its brief about the wisdom of changing the test scoring standards as a remedy for the admittedly adverse testing conditions which occurred in the July, 1982 bar examination. However, the record is undisputed that the Bar Board has not hesitated to modify its test scoring procedures when its members found such adjustments necessary in the past. The hearing record reflects that the Bar Board determined that an excessive number of applicants had 'failed' the essay portion of the July, 1982 bar examination under the original grading standards adopted by the Board. The record indicates that seventeen bar applicants who initially failed the essay portion of the examination were given the benefit of adjusted scores in determining that they had passed the examination. Since the Bar Board has not been reluctant on other occasions to modify the essay test grading standards in order to achieve a test result that would fairly and accurately reflect the applicant's actual knowledge of the subject matter and actual qualifications for admission, it should not refrain from using the same discretion in determining which applicants have passed the MBE portion of the test.

"7. Based upon the entire record in connection with this petition, I conclude that the Bar Board would be fully justified in determining

In light of the very adverse conditions which existed at the time of the writing of the multistate bar examination, as are explained in Justice Sand's opinion, the obvious negative effect upon the applicant, his otherwise high grades, both in the essay part of the examination and in the multistate professional responsibility examination, the recommendation of the Director of Testing for the National Conference of Bar Examiners that the MBE and essay scores be combined in determining the ultimate score, and that a failure to permit such a combination would place us with a very small minority of the courts of this land, I conclude that our Bar Board, in making a negative recommendation in this case, acted unreasonably. However, as the Bar Board had no precedent to guide it, I cannot be too critical of it. The job of the bar examiners is a difficult one at best. Notwithstanding this fact, for the reasons stated herein, I must respectfully reject the negative recommendation of the Board.

## PART II.

Under part two of this discussion, applying the rule as laid down in the Bar Board's brief that Section 27–11–19, N.D.C.C., places responsibility for admissions solely and squarely upon the shoulders of the members of the North Dakota Supreme Court as a matter of first instance, the appropriate result in favor of the petitioner becomes even more obvious. Here let me quote from the brief of the Bar Board.

"Section 27–11–19, NDCC places responsibility for admission solely and squarely upon the shoulders of the North Dakota Supreme Court as a matter of first instance. The Supreme Court and only the Supreme Court may enter an order authorizing the issuance of a certificate of admission to such applicants as the Supreme Court considers entitled thereto.

"A recommendation by the North Dakota State Bar Board in and of itself has no finality, force of law or binding power. There is no case law, statute or rule of which we are aware which establishes its recommendation as one entitled to great weight or one which is not to be overturned unless the Supreme Court determines there has been an abuse of discretion. Neither is the action of the State Bar Board 'adjudicatory' in character. No order, rule, judgment or other appealable determination has been made." Brief of State Bar Board, p. 7, 1.3–19.

If that is the correct state of the law in our state, then surely we have a duty to admit this person under the unique circumstances of this case.

A review of the minutes of a telephone conference call of the Bar Board of October 29, 1982, discloses that, when this matter was first considered, one of the Bar Board members believed it would be reasonable to reduce the multistate bar examination score to 125 in light of the circumstances. Another member of the Bar Board, although not agreeing to that approach, seemed to lean toward combining the scores in light of the circumstances. When the president of the Bar Board expressed the view that the announced policy should stand irrespective of the circumstances, the Board acted to not change the required minimum scaled score, but to permit those that failed the multistate bar examination only, in July of 1982, to retake the multistate bar examination before September 1, 1983.

In my view, the object of the testing is to determine the applicant's qualification to practice law in this state and it is not merely to adhere to some previously stated standard irrespective of the consequences, without variance for circumstances beyond both the applicant's and the Bar Board's control. Some adjustment should be available when conditions are as they were in this case, and, accordingly, if it is our responsibility to determine solely for our-

Note 4—Continued

that the petitioner be recommended favorably for admission to the bar of this state.

"Dated this 9th day of May, 1983.

/s/ Christine Hogan
Christine Hogan,
Bar Board Hearing Officer"

selves what is reasonable, applying common sense and fairness in this case I would permit the applicant to join his colleagues at the bar of justice.

The case *In re Mead,* 372 Mass. 253, 361 N.E.2d 403 is cited by the Bar Board in support of its position that no consideration should be given to the fact that the applicant received a high score on the essay part and a low score on the multistate part of the examination.

In *Mead,* the applicant was complaining that the Board of Bar Examiners was somehow in error in giving equal weight to the MBE and essay parts of the examination. In *Mead,* each applicant's raw MBE score was *combined* with his essay score by the equi-percentile method. This is in contrast with the instant case where the Bar Board refused to combine the scores. In *Mead,* what the applicant sought was a rereading of his essay answers. He was only a fraction of a point from the essay grade score which would have entitled him to have his essay answers reread under the Board of Bar Examiners' Rules. The Massachusetts Supreme Court, in an opinion written by Chief Justice Hennessey in *Mead,* found no abuse of discretion in the Board of Bar Examiners' refusal to reread and regrade the applicant's essay answers.

That case is clearly distinguishable in that a combination of scores was permitted and there was no issue of disturbance. What was denied by the Board of Examiners in *Mead* and sustained by the Supreme Court, a rereading and regrading of the essay part of the examination, was actually granted in this case to others who failed initially to receive a passing score on the essay part of the examination.

In conclusion, it is my view that if we have the power and responsibility to act in the first instance without relying upon the recommendations of the Bar Board or its hearing officer, our decision is easy and

clear under the very peculiar circumstances of this case. We should admit the applicant to the practice of law in this state. He obviously is qualified under any reasonable construction of the term.[5]

VANDE WALLE, Justice.

If the only issue were whether or not the State Bar Board acted arbitrarily or unreasonably in refusing to recommend Thompson for admission to practice law in North Dakota, I would agree with the opinion written by Justice Sand. I do not believe we can conclude that the State Bar Board acted arbitrarily in refusing to combine the MBE and essay scores and therefore I cannot agree with the opinion authored by the Chief Justice.

However, I do believe that the purpose of the test is to determine the applicant's qualifications to practice law in this State. The Bar Board, through its counsel, has implied that Thompson is qualified and I therefore would admit him to practice. If the Bar Board had refused to recommend Thompson's admission and informed us that he is unqualified or that it was unsure of his qualifications I would not approve his admission to practice. This case, because of the circumstances involving the taking of the test and the Bar Board's concession that Thompson is qualified, is most unusual and we should treat it as such.

GIERKE, Justice.

The portion of the Bar Board's brief which is quoted in Chief Justice Erickstad's opinion makes clear the position of the Bar Board that its recommendation was just that—a recommendation—and that this court need not find an abuse of discretion on the part of the Board in order to act contrary to the Board's recommendation.

I cannot agree with Part I of the opinion of Chief Justice Erickstad in finding that

---

5. "... The supreme court, after receiving from the state bar board a report of the results of an examination of applicants for admission to the bar of this state and the recommendations of such board, and after consider-

ing the same, shall enter an order authorizing the issuance of certificates of admission to the bar to such applicants therefor as such court considers entitled thereto...." § 27–11–19, N.D.C.C.

the Bar Board acted unreasonably in making a negative recommendation in this case. Neither can I agree with the opinion of Justice Sand which I believe lacks the flexibility which is afforded by our rules and statutes regarding the admission to practice.

In paragraph 5 of the Findings and Recommendations of the Bar Board Hearing Officer, she states:

"In any event, I find that inflexible adherence to an arbitrary, predetermined, minimum passing MBE score, given the irregularities which occurred during the test, would render meaningless the requirements in the North Dakota Admission to Practice Rules that unsuccessful applicants be given an opportunity to explain their individual concerns in informal interviews and in formal hearings before the Bar Board. I find that one of the purposes for the individual treatment as contemplated in the admission rules is to allow the Bar Board to make an individualized judgment as to a particular applicant's fitness for admission to the bar under the circumstances of the case presented."

I am in agreement with the rationale in the statement of the hearing officer as set forth herein.

In light of the unique circumstances of this case, as well as an apparent concession by counsel for the Bar Board that the petitioner is qualified, I believe a certificate of admission should be issued.

PEDERSON, Justice.

Pursuant to Article VI, § 3, Constitution of North Dakota, in the area of admission to the practice of law, acts of the Legislature supersede rules promulgated by this court. The Legislature has directed that this court "... shall enter an order authorizing the issuance of certificates of admission to the bar to such applicants therefor as such court considers entitled thereto." See § 27–11–19, NDCC. A statutory requirement that applicants be examined by the state bar board was repealed in 1983. See Ch. 82, § 154, S.L.1983, and § 27–11–05, NDCC. This court has adopted rules relating to the admission to practice, including a requirement that certain applicants be admitted upon examination. See present Rule 3, Admission to Practice Rules (formerly Rule 1(b), Admission to Practice Rules).

Thompson sought admission to the practice of law in North Dakota and submitted himself to examination by the state bar board in July 1982. During the examining process, a disturbing noise distracted the examinees. Thompson, and some others, failed to meet the grade standard which the state bar board had announced as necessary for passing. Recognizing its dilemma, the state bar board agonized over the matter without reaching a solution acceptable to a majority, finally concluding that it could not recommend Thompson and the others for admission and offered, instead, to reexamine those who had failed. Most of the applicants accepted the offer and have since been admitted. Thompson elected to follow the procedure provided in present Rule 5, Admission to Practice Rules, seeking the consideration of the Supreme Court.

The bar board attorney, the hearing officer appointed by the bar board, and the experienced counsel retained by Thompson all have, by inference or direct statement, indicated that Thompson is qualified. The conscientious lawyers serving on the bar board do not indicate that Thompson is not qualified but, rather, take a position that they must uphold the integrity of the examining process.

The testing process is certainly entitled to prima facie validity but not when the evidence indicates that, in a specific case, it fails to fairly measure qualifications. Thompson has demonstrated that he is qualified. A certificate of admission should be issued.